## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

ANTONIO M. BOGAN,

           **Plaintiff,**

v.

WEXFORD HEALTH SOURCES, INC.,
VIPIN SHAH, SARA STOVER, and
LYNN PITTMAN,

           **Defendants.**

Case No. 3:19-CV-00590-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion for Summary Judgment filed by Defendants Dr. Lynn Pittman, Dr. Vipin Shah, Sara Stover, and Wexford Health Sources, Inc. ("Wexford") (Doc. 117). Plaintiff Antonio Bogan filed a timely response to the motion (Doc. 136) to which Defendants filed a timely reply (Docs. 138, 139, 140). For the reasons set forth below, the motion is granted in part and denied in part.

### INTRODUCTION

On June 4, 2019, Plaintiff Antonio Bogan, a prisoner in custody of the Illinois Department of Corrections ("IDOC"), filed this action *pro se* pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while incarcerated at Lawrence Correctional Center ("Lawrence") (Doc. 1). When he filed the Complaint, Bogan resided at Lawrence (*Id.*), but he is currently incarcerated at Shawnee Correctional Center

("Shawnee")[1]. Bogan has since filed two amended complaints (Docs. 19, 48). He proceeds on two counts for deliberate indifference in treating his throat cyst and associated pain against Dr. Shah, Dr. Pittman, Stover, and Wexford in violation of the Eighth Amendment (Doc. 48). He also proceeds on one count under Illinois state law for intentional infliction of emotional distress against all defendants (*Id.*).

At the time of the underlying events, Dr. Shah, a licensed physician, worked at Robinson Correctional Center as the Medical Director and occasionally rendered medical care to prisoners at Lawrence (Doc. 118-2). Dr. Pittman, a licensed physician, held the position of Medical Director at Lawrence from February 2019 to July 2020 (Doc. 118-3). Sara Stover worked as a Nurse Practitioner ("NP") at Lawrence from December 2018 to December 2019 (Doc. 118-4). Wexford, a corporation in contract with IDOC, provides medical services to several prisons including Lawrence (Doc. 118-5).

Defendants argue that Bogan cannot set forth any evidence of deliberate indifference to a serious medical need or intentional infliction of emotional distress, and as such, urge the Court to grant summary judgment in their favor (Docs. 117, 118). Alternatively, Bogan argues that many genuine issues of material fact exist and, thus, summary judgment is improper (Doc. 136).

## FACTUAL BACKGROUND

The medical care relevant to this action spans over the course of a year from December 2018 to December 2019. During a level one lockdown at Lawrence, in mid-

---

[1] *See* https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (last visited Sept. 21, 2022).

December 2018, Bogan noticed a sudden swelling in his throat (Docs. 48; 118-1, p. 30). His throat appeared three times its normal size and caused extreme pain (*Id.*). Concerned with this rapid swelling, Bogan drafted several request slips to the healthcare unit and placed them in his door because he had no access to the medical box during lockdown (*Id.*). After lockdown ended, Bogan saw Dr. Shah on December 18 (Docs. 118-2, ¶ 5; 118-6, p. 28). Bogan reported pain and swelling in his throat along with trouble drinking water and eating (*Id.*). Dr. Shah examined Bogan's neck and observed swelling in his thyroid, which caused him to order blood work, request an urgent ultrasound of the neck, inject an antibiotic to treat any infection, prescribe antibiotics and ibuprofen, and order another check-up in a few days (Docs. 118-1, pp. 32-35; 118-2, ¶ 5; 118-6, pp. 28, 274, 284). In collegial review, Wexford's approval process for certain specialty procedures, the ultrasound request was initially denied, and the reviewing physician reasoned that the procedure could wait pending Bogan's response to antibiotic treatment (Doc. 118-6, p. 234).

After his initial appointment, Bogan met with NP Stover three times during the remainder of December. In their first visit, on December 24, Stover examined his thyroid abscess as ordered by Dr. Shah (Docs. 118-4, ¶ 5; 118-6, p. 30). The medical record for that visit, along with Bogan's testimony, indicates that Bogan reported pain and swelling but noticed that each symptom had slightly lessened (Docs. 118-1, p. 36; 118-4, ¶ 5; 118-6, p. 30). Stover ordered a prompt follow-up visit and a continuation of his current medications (Docs. 118-4, ¶ 5; 118-6, p. 30). In the next visit two days later, Bogan's blood work results signaled potential infection (Docs. 118-4, ¶ 6; 118-6, p. 32). Stover

documented the cyst's reduced size and Bogan's report of lessening pain (*Id.*; Doc. 136, p. 34). Stover ordered another two-day follow-up and continuation of the current medication (*Id.*). In their next check-up, Stover recorded that the cyst continued to decrease in size (Docs. 118-4, ¶ 7; 118-6, p. 33). The medical records also indicate that Bogan reported some pain but denied trouble swallowing (*Id.*). In his declaration, Bogan stated that, while he only experienced slight pain at the appointment, he experienced instances of excruciating pain as well (Doc. 136, p. 34). Stover prescribed another antibiotic and ordered another follow-up appointment (*Id.*).

Like the previous month, Bogan met with Stover three times in the beginning of January. On January 2, Stover evaluated Bogan's vitals and observed no change in the cyst (Docs. 118-4, ¶ 8; 118-6, p. 34). She documented that Bogan described the abscess as "starting to hurt," in addition to causing headaches and trouble swallowing (*Id.*; Doc. 136, p. 34). As a result, Stover submitted another collegial referral for an ultrasound and prescribed more antibiotics (Docs. 118-4, ¶ 8; 118-6, p. 34). Two days later, in Bogan's next follow-up appointment, Stover noted that Bogan complained of trouble swallowing and some soreness, but the discomfort seemed to improve (Docs. 118-4, ¶ 9; 118-6, p. 35). At this time, the cyst continued to shrink (*Id.*). As a result, Stover continued the current treatment plan and medications (*Id.*). In his declaration, Bogan stated that during this appointment he told Stover he experienced constant pain and asked for a stronger pain medication which she refused to prescribe (Doc. 136, p. 34). Three days later on January 7, they met again (Doc. 118-6, p. 36). Stover recorded that the cyst continued to shrink but still caused some soreness (Docs. 118-4, ¶ 10; 118-6, p. 36).

An ultrasound of Bogan's throat taken on January 10, which was approved in collegial review after Stover's renewed request, revealed that Bogan likely had a thyroglossal duct cyst (Doc. 118-6, p. 288). In light of this diagnosis, the radiologist recommended further evaluation including cross-sectional imaging (*Id.*). Bogan next met with Dr. Shah on January 21, however, the healthcare unit had not received the ultrasound results, so they scheduled another follow-up visit (Docs. 118-2, ¶ 8; 118-6, p. 42). Two days later, Dr. Shah reviewed the ultrasound results with Bogan and submitted a collegial referral for evaluation with an outside Ear, Nose, and Throat ("ENT") specialist (Docs. 118-2, ¶ 8; 118-6, pp. 42, 238). Approval for the ENT consultation came the next day (Docs. 118-2, ¶ 9; 118-6, pp. 42, 238-239). On January 28, Dr. Shah noted the ENT specialist approval in Bogan's chart (Docs. 118-2, ¶ 9; 118-6, p. 43). This marked the end of Dr. Shah's involvement in treating Bogan (*Id.*). Based on the approval, a consultation was scheduled with an ENT specialist on February 11 (Doc. 118-6, pp. 239-240). In his declaration, Bogan detailed that during this time, he sent four medical requests complaining of extreme pain that ultimately went unanswered and submitted an emergency grievance (Docs. 48, pp. 28-30; 136, p. 35).

As scheduled, Bogan met with an offsite ENT specialist, Dr. Nguyen (Doc. 118-6, pp. 240, 242). Dr. Nguyen found a thyroglossal duct cyst in Bogan's throat and recommended that Bogan receive neck scans and follow-up within two weeks of the scan results (*Id.* at p. 242). Four days after the ENT visit, Bogan visited Dr. Pittman for the first time regarding his cyst (Docs. 118-3, ¶ 5; 118-6, p. 45). Dr. Pittman noticed that Bogan's tonsils felt enlarged and suspected sinusitis or tonsillitis as a potential cause (*Id.*). Heeding

the recommendation of Dr. Nguyen, Dr. Pittman submitted a collegial referral for the MRI of Bogan's neck the same day (*Id.*; Doc. 118-6, p. 241). Dr. Pittman also recommended changes to Bogan's diet with increased water intake (Doc. 118-6, p. 45). Bogan told Dr. Pittman about his throat pain for the past couple months and that he responded well to antibiotic treatments in the past (*Id.*).

Approval for the MRI came through within two weeks (Doc. 118-6, pp. 243-244). Around this time, Dr. Pittman documented growth in Bogan's cyst and made a note to schedule the MRI (Docs. 118-3, ¶ 7; 118-6, p. 46). Bogan's offsite MRI was scheduled for April 2 (Doc. 118-6, pp. 46, 47). In the meantime, Bogan submitted a second emergency grievance because his medical requests went unanswered and he suffered excruciating pain (Doc. 136, pp. 36, 41-43). As a result, Bogan received an appointment with Stover, who informed him of his upcoming MRI (Docs. 118-4, ¶ 12; 118-6, p. 47; 136, p. 36). During this visit, Stover documented that Bogan reported some discomfort when eating but denied any current pain (Docs. 118-4 ¶ 12; 118-6, p. 47). Stover instructed Bogan to follow-up as needed with the healthcare unit (*Id.*).

Less than two weeks later, Bogan's MRI was performed as scheduled at Lawrence County Memorial Hospital (Doc. 118-6, pp. 244-245, 289-290). Three days later, Bogan reported to Dr. Pittman that his sleep and nausea improved, with no nighttime coughing (Docs. 118-3, ¶ 9; 118-6, p. 52). Upon examination, the cyst appeared smaller (*Id.*). Aside from urging Bogan to continue with his dietary changes and increased hydration for his sinusitis, Dr. Pittman noted that she would request collegial referral for a follow-up appointment with the ENT specialist when the healthcare unit received the MRI results

(*Id.*). Bogan's declaration reflects that he told Dr. Pittman about his ongoing stress and anxiety that the cyst was cancerous during this visit (Doc. 136, p. 37).

From here, a substantial amount of time passed until the Lawrence healthcare unit received the MRI results—four months (Doc. 118-6, pp. 289-290). While the completion and transcription of the radiology report occurred on April 3, the day after Bogan's scan, the report was faxed to Lawrence on August 5 (*Id.*).

During this long waiting period, Bogan contends that he submitted several medical request slips for his extreme pain to which he received no response (Doc. 136, pp. 37-38). Bogan went to the healthcare unit in May to retrieve his medical records (*Id.*). While in the healthcare unit, he brought his condition to the attention of the nurses, but they instructed him to submit another medical request (*Id.*). He claims to have done so many more times over the summer to no avail (*Id.*). As such, he filed a third emergency grievance and initiated this lawsuit (*Id.*; Docs. 1; 48, pp. 36-37). In August, shortly before obtaining the MRI results, Bogan also reported to the healthcare unit for a standard TB test, shot, and follow-up (Docs. 118-1, p. 139; 118-6, p. 55).

Finally, on August 5, Lawrence received Bogan's MRI results (Doc. 118-6, pp. 289-290). Four days later, Stover met with Bogan to discuss the results (Doc. 118-6, p. 57). The medical notes from the visit reflect that Bogan complained of soreness in his neck and occasional difficulty eating (*Id.*). Bogan avers that he told Stover of ongoing excruciating pain, difficulty swallowing, breathing, and sleeping (Doc. 136, p. 39). He also told Stover that he suffered stress and anxiety as he feared the cyst could be cancerous and lead to his death (*Id.*). Stover referred Bogan to Dr. Pittman (Doc. 118-6, p. 57). On August 14,

Dr. Pittman examined Bogan's cyst and noted that the cyst had slightly improved over time (Docs. 118-3, ¶ 10; 118-6, p. 58). The notes from the visit, however, showed the cyst measuring at six centimeters in size, indicating recent growth (Doc. 118-6, p. 58). Now equipped with the MRI results, Dr. Pittman submitted a collegial referral for an urgent ENT appointment and possible surgery (Docs. 118-3, ¶ 10; 118-6, pp. 58, 246-249). ENT follow-up was approved a week later, and an appointment with Dr. Nguyen was slated for October 15 (Doc. 118-6, pp. 58, 248). At the eventual appointment, Dr. Nguyen recommended surgical removal of Bogan's cyst (*Id*. at p. 249). A week after the ENT specialist visit, Bogan met with Dr. Pittman again (Docs. 118-3, ¶ 13; 118-6, p. 68). Adhering to the specialist's recommendation, Dr. Pittman submitted a collegial referral for the surgery (*Id*.; Doc. 118-6, p. 250). The surgery was approved and scheduled for November 14 (Docs. 118-3, ¶ 13; 118-6, pp. 68, 265-267).

Bogan underwent surgery as scheduled (Doc. 118-6, pp. 251-263, 267). The cyst was removed, and a drain was inserted at the suture site to empty excess fluid (*Id*.). Upon his return to Lawrence, Bogan stayed in the infirmary for monitoring (Docs. 118-3, ¶ 14; 118-6, pp. 73-82). While there, Dr. Pittman prescribed pain medication and antibiotics for Bogan and submitted a collegial referral for a post-surgical appointment with Dr. Nguyen (Docs. 118-3, ¶ 15-17; 118-6, pp. 73-81). Bogan's drain and sutures were removed a week after surgery (Doc. 118-6, pp. 264-265). After discharge from the infirmary, on December 10, Bogan did not report any further issues with his throat (Docs. 118-3, ¶ 18; 118-6, p. 230).

LEGAL STANDARD

## I.     Summary Judgment

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *see also Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004).

Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp.*, 477 U.S. at 322-24. A moving party is entitled to judgment as a matter of law where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. The party opposing summary judgment must offer admissible evidence in support of his version of events; hearsay evidence does not create a genuine issue of material fact. *Durling v. Menard, Inc.*, No. 18 C 4052, 2020 WL 996520, at *2 (N.D. Ill. Mar. 2, 2020) (citing *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996)). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th

Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

**ANALYSIS**

I.   <u>**Eighth Amendment Deliberate Indifference to Medical Needs**</u>

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition. *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). "[T]he Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, such as disagreement over whether one course of treatment is preferable to another." *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017).

To succeed on a claim of deliberate indifference, a plaintiff must show: (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition. *Berry v. Peterman*, 604 F.3d 435,

Page 10 of 24

440 (7th Cir. 2010); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).

A medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Pyles*, 771 F.3d at 409) (internal quotation marks omitted).

Prevailing on the second prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to prisoner health. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409; *see also Hammond v. Rector*, 123 F. Supp. 3d 1076, 1086 (S.D. Ill. 2015) ("isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry*, 604 F.3d at 440 (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did." *Id.* (quoting *Petties v. Carter*, 836

F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry*, 604 F.3d at 441. A delay in treating a non-life-threatening but painful condition may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged the prisoner's pain. *Arnett,* 658 F.3d at 753 (citing *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010)).

As an initial matter, Defendants concede that Bogan's thyroglossal duct cyst and associated symptoms qualify as a serious medical condition, thus, the objective prong is satisfied.

Turning to the subjective prong, according to Defendants, each medical provider acted within his or her professional judgment to provide appropriate treatment and care for Bogan. On the other hand, Bogan argues that Defendants refused to provide him pain medication which unnecessarily prolonged his pain and that they delayed his treatment by failing to promptly follow the recommendations of his ENT specialist. To satisfy this element, Bogan must show that each individual defendant had subjective knowledge of—and then disregarded—an excessive risk to his health. The Court will evaluate each defendant separately to determine whether a genuine issue of material fact exists as to their sufficiently culpable states of mind.

### a. Dr. Shah

Dr. Shah contributed to Bogan's treatment on three occasions—two patient visits and one chart note. In the first visit, Dr. Shah assessed Bogan's neck, prescribed

antibiotics and ibuprofen, ordered blood work, and put in an urgent request for an ultrasound. He also instructed Bogan to follow up within a few days in an effort to continually monitor his condition. During their second appointment, a little over a month later, Dr. Shah reviewed Bogan's ultrasound results and submitted a collegial referral request for an outside consultation with an ENT specialist. Lastly, Dr. Shah recorded the ENT specialist consultation approval in Bogan's chart so that he could be scheduled for the offsite appointment.

Bogan argues that Dr. Shah unreasonably delayed his treatment and failed to treat his ongoing pain. Bogan is correct that a delay in medical treatment may constitute deliberate indifference if the delay exacerbates the injury or unnecessarily prolongs pain. *Arnett,* 658 F.3d at 753. The record shows that Dr. Shah prescribed pain medication to Bogan after the first appointment along with antibiotics. Thus, Dr. Shah provided treatment for Bogan's pain. Further, Dr. Shah did not act in a way that delayed Bogan's care. In fact, the record shows the opposite. At each appointment, Dr. Shah progressed Bogan's treatment through ordering bloodwork and submitting collegial referrals for an ultrasound and an ENT specialist consultation. Collegial review denied the initial ultrasound request—to first monitor antibiotic response—but Dr. Shah had no control over that process. Further, Dr. Shah only saw Bogan twice over the course of a month, and within that time, Bogan received an ultrasound and a specialist referral. There does not appear to be any unreasonable delay during Dr. Shah's treatment, especially considering that procedures like ultrasounds require scheduling based on availability and time to deliver results.

Even if an unreasonable delay occurred over the course of this first month of treatment, Bogan has not demonstrated that Dr. Shah contributed to the delay. Dr. Shah put in collegial referrals for both the ultrasound and ENT specialist immediately after each visit, and he had no control over the approval process or subsequent scheduling. Besides, in the prison setting, some delays are commonplace due to limited resources. *Petties,* 836 F.3d at 730.

No reasonable jury, on this record, could find that Dr. Shah demonstrated deliberate indifference to Bogan's serious medical need through ignoring his pain or causing an unnecessary delay in treatment. As such, Dr. Shah is entitled to summary judgment.

**b. <u>NP Stover</u>**

Bogan met with Stover much more frequently than Dr. Shah, especially in the beginning of his treatment. From December 24 to January 7, Stover saw Bogan six times. After this initial phase of treatment, Bogan visited Stover on two other occasions, once in March and once in August.

As with the other defendants, Bogan argues Stover demonstrated deliberate indifference in failing to prescribe pain medication and delaying his treatment. In their first set of appointments, Stover monitored Bogan every two to three days and noted his progress. Overall, the medical records indicate that Bogan showed improvement during this time. Stover observed that swelling lessened with each visit or remained the same. Further, the records are devoid of complaints of excruciating or even increasing pain. To the contrary, the progress notes indicate that in the second appointment Bogan described

decreased pain levels. In the third visit, Bogan described the cyst as "a little painful" and he "denie[d] trouble swallowing." In the next appointment, Bogan reported the knot was starting to hurt with some trouble swallowing and headaches. Days later, the medical notes reflect that Bogan stated "the discomfort is getting better, but it's still a little sore." Finally, in the last January visit, Bogan mentioned soreness and shrinking of the lump. Even in his declaration, Bogan describes that in the first three appointments with Stover he mentioned lessening swelling and pain. Regarding the next three appointments, he claims he told Stover of ongoing pain and that the previously prescribed ibuprofen did not help.

First, the medical records evidence that the swelling, the size of the lump, pain, and trouble swallowing continued to decrease over the course of these visits. Based on that information, Stover's decision not to prescribe pain medication was reasonable. She continued to prescribe antibiotics as the swelling and size of the lump appeared to decrease with this treatment. Further, in order to establish deliberate indifference based on medical judgment, Bogan must show that Stover's treating decision fell "so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." *Arnett,* 658 F.3d at 758-59. Considering the information contained in the medical records, Bogan cannot demonstrate such a departure from acceptable professional standards.

Even taking Bogan's declaration as true, that Bogan complained of increasing pain over the course of the latter three visits and asked for stronger pain medication, Stover's actions do not amount to deliberate indifference. Stover continued to prescribe

antibiotics, which appeared effective in decreasing swelling and the size of the cyst. Treating the symptoms of swelling and size could also impact and decrease pain especially related to swallowing. Focusing on this method of treatment, as opposed to prescribing pain medicine, is not unreasonable and merely demonstrates that Stover and Bogan disagreed about the proper course of treatment. Perhaps, at most, Stover negligently failed to prescribe pain medication during these visits. Both fall short of the demanding standard for deliberate indifference. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (mere disagreement with the course of a prisoner's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference.); *see also Whiting*, 839 F.3d at 662 ("It's clear that evidence of medical negligence is not enough to prove deliberate indifference."). Further, Stover ordered that the approved ultrasound be scheduled as soon as possible, which advanced Bogan's medical treatment and eventual diagnosis.

Moving to their next interaction, Bogan met with Stover in March. Bogan filed a grievance prior to this appointment discussing his ongoing pain. The medical records indicate that during the appointment, however, Bogan reported some discomfort when eating and "denie[d] any current pain." At this time, Stover notified Bogan that he was scheduled for an MRI in April. Bogan asserts that Stover denied his request for stronger pain medication. Based on the report of pain reflected in the medical records, Stover did not demonstrate deliberate indifference in declining to prescribe stronger pain medication when Bogan denied any current pain. Moreover, even the ENT specialist, in

an appointment a month earlier, did not prescribe or recommend pain medication of any kind in treating Bogan's cyst.

During Bogan's last appointment with Stover, in August, the progress notes indicate that Bogan reported occasional soreness with difficulty eating and pressure while lying down. At this point, Lawrence received the MRI results, and Stover referred Bogan to Dr. Pittman for next steps. Again, with the limited reports of pain in the medical records, a reasonable jury could not make an inference of deliberate indifference on behalf of Stover for declining to prescribe pain medication.

Certainly, Bogan experienced a substantial delay in treatment having waited four months after his MRI to receive his results and return to the ENT specialist. This delay also seems to have exacerbated Bogan's condition as his cyst grew over this time. But there is no evidence that Stover knew of or contributed to the delay in obtaining Bogan's MRI results. Deliberate indifference requires a culpable state of mind. No such state of mind can be inferred on behalf of Stover as to the delayed delivery of the MRI results.

Bogan also argues that the Defendants, including Stover, failed to heed the instructions of the outside ENT specialist by failing to send him back to the specialist two weeks after the MRI for surgery. But the ENT specialist ordered that Bogan be sent back to the clinic for follow-up two weeks after receiving the CD-ROM results of the scan, which Lawrence did not receive until August. Once the healthcare unit received the results, Stover referred Bogan to Dr. Pittman so he could eventually return to the ENT specialist. Stover did not ignore the specialist's recommendation regarding post-MRI follow-up.

The record reflects that, in the total course of treating Bogan, Stover responded to his reported symptoms, monitored his condition closely, continued in effective antibiotic treatment, and progressed his medical care through scheduling an ultrasound and referring him to the appropriate physician for specialist referral. Moreover, while Bogan suffered a significant delay in treatment from the time of the MRI to the scheduled follow-up with the ENT specialist, there is no evidence to suggest that Stover contributed to or knew of this delay. On this record, no reasonable jury could find that Stover acted with a criminally reckless state of mind. *See Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005). Additionally, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Armato*, 766 F.3d at 719 (7th Cir. 2014). As such, Defendant Stover is entitled to summary judgment on Bogan's deliberate indifference claim.

### c.  Dr. Pittman

In February 2019, Dr. Pittman took over treatment of Bogan's cyst. In their first appointment, Dr. Pittman requested collegial review for Bogan to receive an MRI pursuant to the ENT specialist's recommendation. The medical records indicate that Bogan complained of a persisting sore throat and nausea. Dr. Pittman recorded that Bogan's tonsils were swollen and that Bogan responded well to antibiotic treatment in the past. Suspecting tonsilitis or sinusitis, Dr. Pittman prescribed a change in diet and increased fluid intake. Dr. Pittman next saw Bogan three days after his MRI. During this appointment, she documented that Bogan reported improvement in his nausea and sleeping, with no nighttime coughing. The cyst also appeared to have decreased in size.

The progress notes show that Dr. Pittman intended to follow up once the healthcare unit received the MRI results. In August, after receiving the MRI results, Dr. Pittman submitted a collegial referral for an ENT follow-up and did the same after the specialist recommended surgery. Finally, Dr. Pittman monitored Bogan post-surgery in the Lawrence infirmary for a month. At this time, she prescribed pain medications and antibiotics. She also submitted collegial referrals for a post-operation specialist appointment.

Bogan argues that Dr. Pittman was deliberately indifferent to his pain. He generally takes issue with Dr. Pittman's holistic approach to medicine and the fact that she purportedly delayed follow-up and surgery because she believed his body would heal the cyst on its own. He argues that discussing diet and hydration in their initial appointment circumvented the underlying problem and ignored his pain demonstrating deliberate indifference.

Such an inference is not warranted here. It is clear that Dr. Pittman followed the specialist's advice in sending a collegial referral for MRI. Notably, the specialist did not recommend any pain medication for Bogan's symptoms. Further, Dr. Pittman sought to treat Bogan's potential tonsilitis or sinusitis, which could have been a source of pain, through diet and hydration. The record does not suggest that this treatment is inappropriate for either of those potential conditions. Also, as a new medical provider to Bogan, it is not unreasonable for Dr. Pittman to attempt to provide recommendations as to his overall health, including diet. At most, this demonstrates a difference of opinion regarding treatment of Bogan's condition, or an isolated incident of negligence in

declining to prescribe pain medication which both fall short of deliberate indifference. Upon receiving the MRI results, Dr. Pittman also submitted collegial referrals for specialist follow-ups and surgery, and she monitored his progress in the infirmary while prescribing pain medication and antibiotics. The medical notes from their visits also do not reflect that Bogan reported increasing pain levels. This treatment does not paint a picture of Dr. Pittman's deliberate indifference to the specialist's recommendation or his reported pain.

Bogan also argues that Dr. Pittman caused an unnecessary delay in his treatment. Dr. Pittman saw Bogan three days after his MRI. During that appointment, Dr. Pittman documented that the MRI results were currently unavailable and that she intended to follow up once the healthcare unit received the MRI results. Then, four months passed.

This delay, according to Bogan, demonstrates deliberate indifference on behalf of Dr. Pittman. Different from Stover, Dr. Pittman knew that Lawrence had not received the MRI results days after the scan. Moreover, Dr. Pittman knew of the ENT specialist's recommendation to follow-up within two weeks of receiving the scan results. The Court finds that there is a genuine issue of material fact as to why Dr. Pittman failed to inquire about the scan results with the hospital or why she did not attempt to procure the results over the following four months, which could create an inference of deliberate indifference. Importantly, this delay appears to have exacerbated Bogan's condition as his cyst grew. According to Bogan's testimony and grievances, he also suffered more pain during this time. While the record is unclear as to whether Dr. Pittman knew of or received Bogan's grievances or medical requests during that time, she did know of his

condition, the specialist's recommendations, and that the MRI results were not sent after the scan. As discussed above, delay in medical treatment can create an inference of deliberate indifference if the delay exacerbates the injury or unnecessarily prolongs pain. *Arnett,* 658 F.3d at 753

In August, when the hospital finally faxed the MRI results to Lawrence, Dr. Pittman submitted collegial referrals for an ENT follow-up and surgery, and she provided post-operative care. Dr. Pittman argues that these actions show a lack of deliberate indifference based on the totality of her care. A jury, in weighing this evidence, may agree. But a jury could also find that Dr. Pittman knew of Bogan's need for specialist follow-up after the MRI and consciously disregarded a risk to his health in not attempting to obtain the results earlier, forcing Bogan to wait four months for appropriate treatment.

On this record, a reasonable jury could find that Dr. Pittman acted with a criminally reckless state of mind in allowing a four-month delay in care and, as such, Dr. Pittman is not entitled to summary judgment.

### d.  <u>Wexford Health Sources, Inc.</u>

Bogan asserts that a genuine issue of material fact exists as to whether Wexford inexplicably delayed his ENT follow-up and the surgical removal of his cyst. He proceeds on this claim against Wexford under *Monell.* Wexford's liability is governed by *Monell,* because although Wexford is a private corporation, in providing medical care to prisoners it acts under the color of state law. *Dean v. Wexford Health Sources, Inc.,* 18 F.4th 214, 235 (7th Cir. 2021). To substantiate his claim, Bogan must show that Wexford's express policy or widespread practice or custom directly caused him to suffer a

deprivation of a federal right, and such policy, custom, or practice reflects a conscious disregard for the known or obvious risk of the constitutional deprivation. *Id.* at 235-36.

Bogan argues that Wexford's specialty care policy and collegial review process is flawed. Even just considering his personal circumstances, which is not enough under a *Monell* claim, all of Bogan's specialty care procedures—the ultrasound, ENT consultation, MRI, ENT follow-up, and surgery—were approved in Wexford's collegial review process within days or weeks. The first ultrasound had the longest waiting period of three weeks. In that instance, the collegial review physician urged Bogan's medical providers to monitor his response to antibiotic treatment before sending him for an ultrasound. But the request was renewed and approved shortly thereafter. Each subsequent request was approved in much less time. Moreover, while there is a genuine issue of material fact as to a constitutional violation with the delay in obtaining MRI results, this delay cannot be attributed to any express policy or widespread practice of Wexford, and does not involve the specialist care policy with which Bogan takes issue. Accordingly, Wexford is entitled to summary judgment.

## II.     Intentional Infliction of Emotional Distress

Under Illinois law, three elements are necessary to substantiate a claim of intentional infliction of emotional distress: (1) extreme and outrageous conduct by the defendant, (2) either intent to cause distress or knowledge of a high probability that the defendant's own conduct will cause severe emotional distress, and (3) that severe emotional distress actually resulted. *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 269 Ill.Dec. 228, 798 N.E.2d 75, 80 (2003); *see also Dixon v. County of Cook*, 819 F.3d 343, 351 (7th Cir. 2016).

To constitute extreme and outrageous conduct, a defendant's actions must be so extreme as to go beyond all possible bounds of decency, which would be regarded as intolerable in a civilized society. *Feltmeier*, 798 N.E.3d at 81 (citing *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d at 21, 180 Ill.Dec. 307, 607 N.E.2d 201 (1992)).

As discussed above, Dr. Shah and Stover's actions in treating Bogan's cyst fell within professional standards of reasonable care. Certainly, on the facts in this record, their conduct could not be described as extreme and outrageous or going beyond all possible bounds of societal decency. Further, the medical records contain no evidence that Dr. Shah knew of Bogan's stress and anxiety related to his condition or his family history of cancer, much less that he used such knowledge to intentionally cause Bogan severe emotional distress. Bogan's declaration indicates that he mentioned his anxiety to Stover in March, but even taken as true, there is no evidence that she knew of his family history of cancer or understood his concerns to rise above the normal level of anxiety associated with any medical issue. Nothing in the record suggests that Stover exploited this knowledge to intentionally cause Bogan emotional distress.

Bogan, in his declaration, also suggests that he told Dr. Pittman of his anxiety and fear of dying because of the cyst. The medical records do not reflect any complaints of fear or anxiety. Similar to Stover, there is no indication that Dr. Pittman knew of Bogan's family history of cancer or understood the anxiety to be more than general medical concern. Although the Court has determined that a genuine issue of material fact exists as to Dr. Pittman's deliberate indifference in delaying care, the subjective standard is akin to recklessness, not an intentional state of mind. Thus, even if a jury could find Dr.

Pittman acted deliberately indifferent, there is no evidence in the record that she acted intentionally to cause Bogan severe emotional distress.

Accordingly, Bogan's claim of intentional infliction of emotional distress cannot survive summary judgment.

CONCLUSION

For these reasons, the motion for summary judgment (Doc. 117) is **GRANTED** as to Vipin Shah, Sara Stover, and Wexford Health Sources, Inc. on all claims, and as to Dr. Pittman on the claim of intentional infliction of emotional distress**.** The motion is **DENIED** as to Dr. Pittman for deliberate indifference in delaying medical care.

Further, by separate order, the Court will appoint counsel for Bogan as the case moves beyond summary judgment. He has previously demonstrated indigence and has attempted to procure counsel on his own, and now, with the procedural posture of the case, it will be challenging for Bogan to litigate the remaining claim on his own. *See Pruitt v. Mote,* 503 F.3d 647, 654-55 (7th Cir. 2007). Once counsel is appointed, a status conference will be set to select a firm trial date.

**IT IS SO ORDERED.**

**DATED:  September 23, 2022**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**